FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 OCT 29 PM 4: 55

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **LOMCO, INC.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 02-1044** |
| | * | |
| **FALCON STEEL STRUCTURES, INC.,** | * | **SECTION "B"** |
| **CHAD CHANDLER AND TERRY** | * | |
| **FORRESTER, INDIVIDUALLY AND/OR** | * | **MAG. (4)** |
| **D/B/A LABOR CONSULTANTS** | * | |
| **INTERNATIONAL, L.L.C.** | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND OTHER RELIEF

Falcon Steel Structures, Inc., Chad Chandler, Terry Forrester and Labor Consultants

International, L.L.C., through their counsel of record, move the Court for summary judgment in their

favor, dismissing the claims asserted by Lomco, Inc., plaintiff, with prejudice and awarding all

taxable costs and other relief allowed by law to the defendants, on the basis that the undisputed

material facts establish that the defendants are entitled to judgment as a matter of law for the reasons

more particularly described in the attached Memorandum. The defendants alternatively move the

Court for such other relief as may be allowed by law, including the entry of partial summary

judgment on the issues relating to the termination of the arrangement between Lomco and the

defendants regarding the Indian National workers furnished for work at Quality Shipyards, L.L.C.

Fee_____
Process____
___ dg
___ 26

Respectfully submitted:

_GEORGE D. FAGAN (#14260)_
Leake & Andersson, L.L.P.
1100 Poydras Street
1700 Energy Centre
New Orleans, Louisiana 70163
Telephone: (504) 585-7500
Facsimile: (504) 585-7775

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 29, 2002, a copy of the foregoing pleading was served upon all counsel of record by United States mail at their last known address, first class postage prepaid.

_GEORGE D. FAGAN_

2

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **LOMCO, INC.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 02-1044** |
| | * | |
| **FALCON STEEL STRUCTURES, INC.,** | * | **SECTION "B"** |
| **CHAD CHANDLER AND TERRY** | * | |
| **FORRESTER, INDIVIDUALLY AND/OR** | * | **MAG. (4)** |
| **D/B/A LABOR CONSULTANTS** | * | |
| **INTERNATIONAL, L.L.C.** | * | |
| | * | |

**********************************************************************************

## DEFENDANTS' STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OTHER RELIEF ALLOWED BY LAW

Falcon Steel Structures, Inc. ("Falcon Steel"), Chad Chandler ("Mr. Chandler"), Terry

Forrester ("Mr. Forrester") and Labor Consultants International, L.L.C. ("LCI"), jointly referred to

herein as defendants, through their counsel of record, submit the following Statement of Uncontested

Material Facts in support of their Motion for Summary Judgment and other relief allowed by law:

    1.      The defendants and Lomco, Inc. ("Lomco"), plaintiff, arranged for two separate

groups of Indian nationals to work as welders and fitters at Quality Shipyards, L.L.C. in Houma,

Louisiana, and split the gross profits in two different ways: Falcon Steel and LCI received 75% of

the gross profits for the first group of Indian nationals who began working in approximately March

2001, with Lomco receiving 25%; and, the allocation was reversed for the second group of Indian

nationals who began working over the summer of 2001.

2.      The Indian nationals were employed by Falcon Steel, and Labor Consultants provided services in connection with the admission of those workers to the United States. See, September 24, 2002 Deposition of Terry Forrester (attached as Exhibit 1), pp. 6, 14, 29-36; and September 24, 2002 Deposition of Chad Chandler (attached as Exhibit 2), pp. 7-8.

3.      Falcon Steel and Chad Chandler are based in Centreville, Mississippi, and Labor Consultants and Mr. Forrester are based in Post Falls, Idaho. Forrester, p. 10.

4.      Lomco is based in Houma, and provided the local management and other services for the Indian national workers.

5.      In late 2000, Labor Consultants arranged for work visas for 35-40 Indian nationals to be employed by Falcon Steel, but Falcon Steel did not have work for the Indian nationals when the men arrived due to delays and other problems involved with getting work visas for foreign nationals to work in the United States. Forrester, p. 14, 29-42, 60 & 104-105; Chandler, pp. 9-21.

5.      Labor Consultants lodged the men in Houma, and began looking for places where the men could be employed. Forrester, p. 36-41 & 45-46. This lasted about two months. Chandler, 16-17.

6.      Lomco is in the business of hiring personnel to work as welders and fitters at various shipyards in the Houma, Louisiana area. See, September 23, 2002 deposition of Pat Lombas (attached as Exhibit 3), p. 14.

7.      Before the persons furnished by Falcon Steel started to work at Quality Shipyards in Houma, Lomco did not supply any welders or fitters to Quality Shipyards. Lombas, p. 15.

8.     The February 26, 2001 work contract was Lomco's first contract with Quality Shipyards. Lombas, pp. 16-17.

9.     Mr. Lombas and Harris Guidry of Lomco got in contact with Chad Chandler through meeting some Indian Nationals at a service station in Houma. Lombas, pp. 18-19; and, September 23, 2002 Deposition of Harris Guidry (attached as Exhibit 4), p. 13. When Mr. Lombas asked the Indian national what he was doing there, he said he was trying to get work as a welder or a fitter, and Mr. Lombas ultimately met with Terry Forrester and told him that he could put some of the Indian Nationals to work. Lombas, pp. 18-21; Guidry, p. 14.

10.     When he met with Terry Forrester, Mr. Forrester told Mr. Lombas that he had already made a proposal to Quality Shipyards, and had also been approached by Hutco about them using the Indian Nationals as workers. Forrester, pp. 42-44. Lombas, pp. 21-23; Guidry, p. 15; and, Chandler, p. 28 & 44.

11.     Lombas and Guidry thereafter met with Chad Chandler and Terry Forrester, and then all three of them met with Quality Shipyards. Lombas, pp. 23-24; Guidry, pp. 14-15. Lombas, Chandler and Forrester next met with Bobby Barthel of Quality Shipyards, and reached a working agreement whereby the Indian Nationals were going to work at Quality Shipyards as welders and fitters and do so through Lomco. Lombas, pp. 23-25.

12.     Initially, about thirty or forty Indian Nationals started working at Quality Shipyards. Lombas, p. 26; Forrester, p. 60.

13.     The arrangement between Lomco and the defendants was that the defendants would get 75% of the profit from the work performed by the Indian Nationals who originally started working at Quality Shipyards with Lomco to get 25% of the profit.    Lombas, pp. 26-27; Guidry,

pp. 16-18; Chandler, p. 25.

14.     With respect to any new Indian Nationals later brought to work at Quality Shipyards, the arrangement was to be reversed, with Lomco getting 75% of the profit and the defendants getting 25%. Lombas, pp. 26-27; Guidry, pp. 16-18; Chandler, pp. 27-29 & 31.

15.     Forrester and Chandler both testified that the arrangement with Lomco was to last no longer that December 2001, when the visas of Indian nationals expired.  Forrester, p. 54, 62; Chandler, p. 24-25.

16.     Forrester told Lombas that things would probably change after the visas expired in December 2001.  Forrester, p. 63.

17.     The 75/25 split arrangement for the two separate groups continued until the defendants met with Mr. Lombas in late February 2002 and terminated the arrangement.  Forrester, pp. 67-68.

18.     There was no written agreement between Lomco and the defendants.  Lombas, p. 31.

19.     Mr. Lombas had no idea how long the thirty to forty Indians that were first working at Quality Shipyards could stay in the United States because work visas can only be renewed for three consecutive nine month periods.  Lombas, pp. 31-32; Guidry, p. 20; and, Forrester, p. 55.

20.     Mr. Lombas was aware that Terry Forrester had to renew some of the visas at some point.  Lombas, pp. 34-35; Forrester, pp. 54-55.

21.     Lomco provided various services in connection with the employment of the Indian nationals at Quality Shipyards. Lomco transported the workers if they got hurt or sick, and hired a coordinator to stay in the yard at all times.  Lombas, p. 44 & 47.  Lomco had a Quality Shipyard Company radio and a little office trailer inside a shipyard as well.  Lombas, p. 44.  Lomco did the

payroll and paid for the insurance for the Indian National workers. Lombas, pp. 45-48. Quality Shipyards prepared the time sheets for the Indian National workers, and Mr. Lombas used this to make payroll for the Indian National workers and sending invoices to Quality Shipyards. Lombas, p. 45. Two to four persons within Lomco's office had some involvement with the Indian National workers at Quality Shipyards. Lombas, p. 46-48.

22.    When asked about the term of the arrangement, Mr. Lombas testified as follows:

Q.    How long is this contract for?

A.    Forever.

Q.    Forever? It's an indefinite contract? Is that right? No end, right?

A.    That's right. Yes.

Q.    It can't be canceled by anybody at any time for any reason; is that right?

A.    Yeah, that's right.

Lombas, p. 40.

23.    When Chad Chandler told him that the agreement was supposed to end when the visas came up for renewal in December 2001, Mr. Lombas said: "No, there was never no agreement and no date, just an agreement that I was going to work for people at Quality." Lombas, p. 61. Mr. Lombas added: "We never had no date." Lombas, p. 61.

24.    Mr. Lombas identified several events that would end the arrangement. If Lomco could not find any work for the Indian National workers, they would not get paid by Lomco. Lombas, p. 41. Likewise, if Quality Shipyards decided to stop using the Indian National workers, the contract would be over, and the defendants would have the right to go on their own way at that point. Lombas, pp. 41-42.

5

25.    Mr. Lombas gave gifts to Quality Shipyards personnel (ice chests of shrimp or bait for fishing trips, Saints stickers, and a golf club) in violation of Quality Shipyards' written policy against vendors offering such gifts, gratuities and entertainment. Lombas, pp. 42-43.

26.    Quality Shipyards complained to Chandler about Lomco's gratuities. Chandler, p. 54.

27.    The insurance procured by Lomco listed about 50% of Lomco's payroll as paper hangers or painters even though none of the Indian Nationals who were working at Quality Shipyards were doing any such work. Lombas, p. 51-52.

28.    Mr. Lombas provided the information to A Plus Insurance Agency about the type of people who are going to be working on the job and the payroll and the rate. Lombas, pp. 52-53 & 55.

29.    When asked how he characterized the workers at Quality Shipyards, Mr. Lombas said "because how it's -- that's how it's done in this industry." Lombas, p. 54. Mr. Lombas continued his explanations by saying that this was so "because of the money that you was -- the money that you was making at a shipyard, if you would have to pay it as welder and fitter, you wouldn't be making enough money." Lombas, pp. 54-55.

30.    Forrester and Chandler were concerned about Lomco's characterization of the Indian national workers. Forrester, pp. 69-71 & 78-82; Chandler, p. 48.

31.    Falcon Steel changed the way the men were classified after Lomco was terminated. Forrester, pp. 81-82.

32.    Lomco bounced payroll checks issued to some of the Indian Nationals on two or three occasions. Lombas, pp. 62-63.

33.     Forrester and Chandler were concerned about Lomco's problems with bouncing payroll checks. Forrester, pp. 84-85; Chandler, pp. 53-54.

34.     Quality Shipyards was concerned about Lomco's financial status. Chandler, p. 58.

35.     Lomco was not paying some of the payroll taxes when they became due. Lombas, p. 63; Forrester, p. 95; Chandler, pp. 63-65.

36.     As much as $40,000 in payroll taxes was owed when the defendants advised Mr. Lombas that they were terminating the agreement. Lombas, pp. 63-64.

37.     Quality Shipyards made general complaints to the defendants about Lomco's lack of supervision and management of the Indian nationals. Forrester, pp. 70-73; Chandler, pp. 48-59.

38.     Falcon Steel changed the way that the Indian nationals were managed and supervised at Quality Shipyards after Lomco was terminated. Forrester, pp. 74-77.

39.     Chad Chandler had problems communicating with Mr. Lombas, who would not return his calls because Lombas preferred to deal with Terry Forrester. Chandler, pp. 49-51 & 54-60.

40.     Bobby Barthel of Quality Shipyards met with Chandler and Forrester to discuss Lomco's payroll and management problems, and stated that if something was not done that the relationship would probably end. Forrester, pp. 90-92; and, Chandler, pp. 50-55.

41.     These problems led up to the meeting between Lombas, Chandler and Forrester that took place at the Outback Restaurant in Houma in late February 2002. Forrester, pp. 67-68.

42.     Chandler wanted to terminate the arrangement with Lomco because of the potential liabilities due to Lomco's problems with the job. Forrester, p. 94.

43.     When Mr. Lombas was finally told that the contract was going to be terminated, Mr. Lombas told him that he needed to finish paying the taxes and asked them to give him two or three

more weeks so that he could pay back the taxes and get recovery for the expenses that he incurred in Dubai. Lombas, pp. 79-80.

44. After the Outback Steakhouse meeting, Chandler and Forrester were willing to help Lomco out with its tax liabilities. Lombas, pp. 75-76; Forrester, pp. 97-100; Chandler, pp. 65-67.

45. After Chad Chandler and Terry Forrester had a chance to discuss the matters, Terry told Mr. Lombas that they had decided to keep Lomco out of the contract, and Mr. Lombas' response was: "Well, I'm keeping the money." Lombas, p. 77.

46. Mr. Lombas testified that he thought about the defendants' offer and then decided "I'm going to find me an attorney." Lombas, p. 80; Chandler, pp. 67-68.

47. When the agreement between Lomco and the defendants was terminated, Lomco was two or three weeks behind in making the profit sharing payments to the defendants. Lombas, p. 72.

48. Lomco stopped payment on at least one of the checks that was issued to the defendants for their profit share. Lombas, p. 72.

49. Mr. Lombas estimates that there is about $40,000.00 in undistributed profits that was not paid to the defendants. Lombas, pp. 74-75. Mr. Lombas decided to keep the money.

50. On April 22, 2002, Bobby Barthel of Quality Shipyards sent Lomco a letter terminating the work contract between Lomco and Quality Shipyards. Lombas, pp. 69-70. The termination was effective on May 3, 2002. Lombas, p. 70.

Respectfully submitted:

GEORGE D. FAGAN (#14260)
Leake & Andersson, L.L.P.
1100 Poydras Street
1700 Energy Centre
New Orleans, Louisiana 70163
Telephone: (504) 585-7500
Facsimile: (504) 585-7775

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 29, 2002, a copy of the foregoing pleading was served upon all counsel of record by United States mail at their last known address, first class postage prepaid.

GEORGE D. FAGAN

9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **LOMCO, INC.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 02-1044** |
| | * | |
| **FALCON STEEL STRUCTURES, INC.,** | * | **SECTION "B"** |
| **CHAD CHANDLER AND TERRY** | * | |
| **FORRESTER, INDIVIDUALLY AND/OR** | * | **MAG. (4)** |
| **D/B/A LABOR CONSULTANTS** | * | |
| **INTERNATIONAL, L.L.C.** | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>NOTICE OF HEARING</u>

**PLEASE TAKE NOTICE** that Falcon Steel Structures, Inc., Chad Chandler, Terry Forrester and Labor Consultants International, L.L.C., defendants, through their undersigned counsel of record, will bring the foregoing Motion for Summary Judgment and Other Relief for hearing before the Hon. Ivan L.R. Lemelle, United States District Judge, 500 Camp Street, New Orleans, Louisiana 70130, at 9:00 a.m. on November 13, 2002, or at such other date and time as may be set by the Court.

Respectfully submitted:

GEORGE D. FAGAN (#14260)
Leake & Andersson, L.L.P.
1100 Poydras Street
1700 Energy Centre
New Orleans, Louisiana 70163
Telephone: (504) 585-7500
Facsimile: (504) 585-7775

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 29, 2002, a copy of the foregoing pleading was served upon all counsel of record by United States mail at their last known address, first class postage prepaid.

GEORGE D. FAGAN

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **LOMCO, INC.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 02-1044** |
| | * | |
| **FALCON STEEL STRUCTURES, INC.,** | * | **SECTION "B"** |
| **CHAD CHANDLER AND TERRY** | * | |
| **FORRESTER, INDIVIDUALLY AND/OR** | * | **MAG. (4)** |
| **D/B/A LABOR CONSULTANTS** | * | |
| **INTERNATIONAL, L.L.C.** | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT
## AND OTHER RELIEF ALLOWED BY LAW

Falcon Steel Structures, Inc. ("Falcon Steel"), Chad Chandler ("Mr. Chandler"), Terry

Forrester ("Mr. Forrester") and Labor Consultants International, L.L.C. ("LCI"), jointly referred to

herein as defendants, through their counsel of record, submit the following Memorandum in Support

of Their Motion for Summary Judgment and other relief allowed by law:

### Summary of the Argument

The essential and undisputed material facts are as follows: The defendants and Lomco, Inc.

("Lomco"), plaintiff, arranged for two separate groups of Indian nationals to work as welders and

fitters at Quality Shipyards, L.L.C. in Houma, Louisiana, and split the gross profits in two different

ways. Falcon Steel and LCI received 75% of the gross profits for the first group of Indian nationals

who began working in approximately March 2001, with Lomco receiving 25%. The allocation was reversed for the second group of Indian nationals who began working over the summer of 2001. The Indian nationals were employed by Falcon Steel, and Labor Consultants provided services in connection with the admission of those workers to the United States. See, September 24, 2002 Deposition of Terry Forrester (attached as Exhibit 1), pp. 6, 14, 29-36; and September 24, 2002 Deposition of Chad Chandler (attached as Exhibit 2), pp. 7-8. Falcon Steel and Chad Chandler are based in Centreville, Mississippi, and Labor Consultants and Mr. Forrester are based in Post Falls, Idaho. Forrester, p. 10. Lomco is based in Houma, and provided the local management and other services for the Indian national workers. The defendants terminated the arrangement in February 2002, and Lomco seeks damages for wrongful termination.

The defendants bring this motion because the arrangement between the defendants and Lomco either expired in December 2001, and thereafter was of unspecified duration, or was always of unspecified duration. The distinction is not material because the defendants terminated the arrangement with Lomco in late February 2002, and provided reasonable notice to Lomco. Louisiana Civil Code article 2024 states: "A contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party." For the reasons discussed in more detail below, Lomco's claims for wrongful termination should be dismissed as a matter of law.

### Summary of the Facts

In late 2000, Labor Consultants arranged for work visas for 35-40 Indian nationals to be employed by Falcon Steel, but Falcon Steel did not have work available for the Indian nationals to perform when the men arrived due to delays and other problems involved with getting work visas

2

for foreign nationals to work in the United States. Forrester, p. 14, 29-42, 60 & 104-105; Chandler, pp. 9-21. Labor Consultants lodged the men in Houma, and began looking for places where the men could be employed. Forrester, p. 36-41 & 45-46. This lasted about two months. Chandler, 16-17.

Lomco is in the business of hiring personnel to work as welders and fitters at various shipyards in the Houma, Louisiana area. See, September 23, 2002 deposition of Pat Lombas (attached as Exhibit 3), p. 14.

Mr. Lombas and Harris Guidry of Lomco got in contact with Chad Chandler through meeting some Indian Nationals at a service station in Houma. Lombas, pp. 18-19; and, September 23, 2002 Deposition of Harris Guidry (attached as Exhibit 4), p. 13. When Mr. Lombas asked the Indian national what he was doing there, he said he was trying to get work as a welder or a fitter, and Mr. Lombas ultimately met with Terry Forrester and told him that he could put some of the Indian Nationals to work. Lombas, pp. 18-21; Guidry, p. 14. When he met with Terry Forrester, Mr. Forrester told Mr. Lombas that he had already made a proposal to Quality Shipyards, and had also been approached by Hutco about them using the Indian Nationals as workers. Forrester, pp. 42-44. Lombas, pp. 21-23; Guidry, p. 15; and, Chandler, p. 28 & 44. Before the persons furnished by Falcon Steel started to work at Quality Shipyards in Houma, Lomco did not supply any welders or fitters to Quality Shipyards. Lombas, p. 15. The February 26, 2001 work contract was Lomco's first contract with Quality Shipyards. Lombas, pp. 16-17.

Lombas and Guidry thereafter met with Chad Chandler and Terry Forrester, and then all three of them met with Quality Shipyards. Lombas, pp. 23-24; Guidry, pp. 14-15. Lombas, Chandler and Forrester next met with Bobby Barthel of Quality Shipyards, and reached a working agreement whereby the Indian Nationals were going to work at Quality Shipyards as welders and fitters and do

3

so through Lomco. Lombas, pp. 23-25. It was about two or three weeks between the time that Mr. Lombas first went met the Indian National at the service station and then the Indian Nationals began working at Quality Shipyards. Lombas, p. 25. Initially, about thirty or forty Indian Nationals started working at Quality Shipyards. Lombas, p. 26; Forrester, p. 60.

The arrangement between Lomco and the defendants was that the defendants would get 75% of the gross profit from the work performed by the Indian Nationals who originally started working at Quality Shipyards, with Lomco to get 25% of the gross profit. Lombas, pp. 26-27; Guidry, pp. 16-18; Chandler, p. 25. With respect to any new Indian Nationals later brought to work at Quality Shipyards, the arrangement was to be reversed, with Lomco getting 75% of the gross profit and the defendants getting 25%. Lombas, pp. 26-27; Guidry, pp. 16-18; Chandler, pp. 27-29 & 31. Forrester and Chandler both testified that the arrangement with Lomco was to last no longer that December 2001, when the visas of Indian nationals expired. Forrester, p. 54, 62; Chandler, p. 24-25. Forrester told Lombas that things would probably change after December 2001. Forrester, p. 63. The split arrangement continued until the defendants met with Mr. Lombas in late February 2002 and terminated the arrangement. Forrester, pp. 67-68.

There was no written agreement between Lomco and the defendants. Lombas, p. 31. Mr. Lombas admitted that he had no idea how long the thirty to forty Indians that were first working at Quality Shipyards would stay in the United States because work visas can only be renewed for three consecutive nine month periods. Lombas, pp. 31-32; Guidry, p. 20; and, Forrester, p. 55. Mr. Lombas was aware that Terry Forrester had to renew some of the visas at some point. Lombas, pp. 34-35; Forrester, pp. 54-55.

4

Lomco provided various services in connection with the employment of the Indian nationals at Quality Shipyards. Lomco transported the workers if they got hurt or sick, and hired a coordinator to stay in the yard at all times. Lombas, p. 44 & 47. Lomco had a Quality Shipyard Company radio and a little office trailer inside a shipyard as well. Lombas, p. 44. Lomco did the payroll and paid for the insurance for the Indian National workers. Lombas, pp. 45-48. Quality Shipyards prepared the time sheets for the Indian National workers, and Mr. Lombas used this to make payroll for the Indian National workers and sending invoices to Quality Shipyards. Lombas, p. 45. Two to four persons within Lomco's office had some involvement with the Indian National workers at Quality Shipyards. Lombas, p. 46-48.

When asked about the term of the arrangement, Mr. Lombas testified as follows:

Q.      How long is this contract for?

A.      Forever.

Q.      Forever? It's an indefinite contract? Is that right? No end, right?

A.      That's right. Yes.

Q.      It can't be canceled by anybody at any time for any reason; is that right?

A.      Yeah, that's right.

Lombas, p. 40. When Chad Chandler told him that the agreement was supposed to end when the visas came up for renewal in December 2001, Mr. Lombas said: "No, there was never no agreement and no date, just an agreement that I was going to work for people at Quality." Lombas, p. 61. Mr. Lombas added: "We never had no date." Lombas, p. 61.

Despite his testimony about the indefinite term of the contract, Mr. Lombas identified several events that would end the arrangement in his view. If Lomco could not find any work for the Indian

5

National workers, they would not get paid by Lomco. Lombas, p. 41. Likewise, if Quality Shipyards decided to stop using the Indian National workers, the contract would be over, and the defendants would have the right to go on their own way at that point. Lombas, pp. 41-42.

Several problems arose with Lomco's involvement with the Indian national workers employed at Quality Shipyards:

First, Mr. Lombas gave gifts to Quality Shipyards personnel (ice chests of shrimp or bait for fishing trips, Saints stickers, and a golf club) in violation of Quality Shipyards' written policy against vendors offering such gifts, gratuities and entertainment. Lombas, pp. 42-43. Quality Shipyards complained to Chandler about the gratuities. Chandler, p. 54.

Second, the insurance procured by Lomco listed about 50% of Lomco's payroll as paper hangers or painters even though none of the Indian Nationals who were working at Quality Shipyards were doing any such work. Lombas, p. 51-52. Mr. Lombas provided the information to A Plus Insurance Agency about the type of people who are going to be working on the job and the payroll and the rate. Lombas, pp. 52-53 & 55. When asked how he characterized the workers at Quality Shipyards, Mr. Lombas said "because how it's -- that's how it's done in this industry." Lombas, p. 54. Mr. Lombas continued his explanation by saying that this was so "because of the money that you was -- the money that you was making at a shipyard, if you would have to pay it as welder and fitter, you wouldn't be making enough money." Lombas, pp. 54-55. Forrester and Chandler were concerned about their liability exposure because of Lomco's inaccurate characterization of the Indian national workers. Forrester, pp. 69-71 & 78-82; Chandler, p. 48. Falcon Steel changed the way the men were classified after Lomco was terminated. Forrester, pp. 81-82.

6

Third, Mr. Lombas admitted that Lomco bounced payroll checks issued to some of the Indian Nationals on two or three occasions. Lombas, pp. 62-63. Forrester and Chandler were very concerned about Lomco's problems with bouncing payroll checks, which were indicative of financial problems. Forrester, pp. 84-85; Chandler, pp. 53-54 & 58. Quality Shipyards was concerned about Lomco's financial status. Chandler, p. 58.

Fourth, Mr. Lombas admitted that he was not paying the payroll taxes when they became due and the defendants were very concerned about this. Lombas, p. 63; Forrester, p. 95; Chandler, pp. 63-65. Mr. Lombas admitted that as much as $40,000 in payroll taxes was owed when the defendants advised him that they were terminating the agreement. Lombas, pp. 63-64. Forrester and Chandler were concerned about their liability exposure. Forrester, pp. 69-71.

Fifth, Quality Shipyards made general complaints about Lomco's supervision and management of the Indian nationals. Forrester, pp. 70-73; Chandler, pp. 48-59. Falcon Steel changed the way that the Indian nationals were managed and supervised at Quality Shipyards after Lomco was terminated. Forrester, pp. 74-77.

Finally, Chad Chandler had problems communicating with Mr. Lombas, who would not return his calls because Lombas preferred to deal with Terry Forrester. Chandler, pp. 49-51 & 54-60.

Bobby Barthel of Quality Shipyards met with Chandler and Forrester to discuss Lomco's payroll and management problems, and stated that if something was not done that the relationship would probably end. Forrester, pp. 90-92; and, Chandler, pp. 50-55. These problems led up to the meeting between Lombas, Chandler and Forrester that took place at the Outback Restaurant in Houma in late February 2002. Forrester, pp. 67-68. Chandler wanted to terminate the arrangement

7

with Lomco because of the potential liabilities due to Lomco's problems with the job. Forrester, p. 94.

When Mr. Lombas was finally told that the contract was going to be terminated, Mr. Lombas told him that he needed to finish paying the taxes and asked the defendants to give Lomco two or three more weeks so that he could pay back the taxes and get recovery for the expenses that he incurred in Dubai. Lombas, pp. 79-80. After the Outback Steakhouse meeting, Chandler and Forrester were willing to help Lomco out with its tax liabilities. Lombas, pp. 75-76; Forrester, pp. 97-100; Chandler, pp. 65-67. After Chad Chandler and Terry Forrester had a chance to discuss the matters, Mr. Forrester told Mr. Lombas that they had decided to keep Lomco out of the contract, and Mr. Lombas' response was: "Well, I'm keeping the money." Lombas, p. 77. Mr. Lombas testified that he thought about the defendants' offer and then decided "I'm going to find me an attorney." Lombas, p. 80; Chandler, pp. 67-68.

When the agreement between Lomco and the defendants was terminated, Lomco was two or three weeks behind in making the profit sharing payments to the defendants. Lombas, p. 72. Lomco stopped payment on at least one of the checks that was issued to the defendants for their profit share. Lombas, p. 72. Mr. Lombas estimates that there is about $40,000.00 in undistributed profits that was not paid to the defendants. Lombas, pp. 74-75. Mr. Lombas decided to keep the money.

On April 22, 2002, Bobby Barthel of Quality Shipyards sent Lomco a letter terminating the work contract between Lomco and Quality Shipyards. Lombas, pp. 69-70. The termination was effective on May 3, 2002. Lombas, p. 70.

## Law and Argument

The defendants request that the Court grant summary judgment in their favor, dismissing Lomco's claims with prejudice, and alternatively request such other relief as may be allowed by law.

### 1.     Standards for Consideration of Motions for Summary Judgment

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). If the plaintiff fails to present factual evidence in support of any claim, or if the evidence is insufficient to justify the continuance of any claim against a defendant, then there is no genuine issue of material fact regarding those claims and they should be dismissed. Morin v. Caire, 77 F.3d 116, 123 (5th Cir. 1996).

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists." Edwards v. Your Credit, Inc., 148 F.3d 427, 431 (5th Cir. 1998); Williams v. Henderson, 2001 WL 576187, pp. 3-4 (E.D. La. 2001). The inquiry for summary judgment, as with the inquiry for the granting of a directed verdict, is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Cooper/T. Smith, In re, Anderson v. Liberty Lobby, Inc., 929 F.2d 1073 at 1076 (5th Cir. 1991)(quoting, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The District Court's primary function in assessing the propriety of summary judgment is to assess the evidence overall and determine whether the available evidence

9

warrants judgment in favor of the moving party, considering the substantive law involved and the applicable standards of proof. <u>Anderson</u>, 106 S.Ct. 2505, 2513.

Federal Rule 56 "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505, 2510-2511 (1986) (emphasis original) (Brennan, J., Rehnquist, J., and Burger, J. *dissenting*). "Accordingly, [f]actual disputes that are irrelevant or unnecessary will not be counted." <u>Id</u>. at 2511. Even if the non-moving party submits evidence in opposition to summary judgment, if "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id</u>.

### 2. The Arrangement Between the Parties Was of Unspecified Duration and the Defendants Provided Lomco with Reasonable Notice of the Termination

Louisiana Civil Code article 2024 states:

> A contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party.

Mr. Lombas and Mr. Guidry admitted that the arrangement with the defendants was indefinite, which means that it had an unspecified duration as a matter of law. Mr. Chandler and Mr. Forrester testified that the definite term of the arrangement would last only through December 2001. In either circumstance, there is no dispute that the arrangement had no specified duration when Chandler, Forrester and Lombas met at the Outback Restaurant in late February 2002. Mr. Chandler and Mr. Forrester gave reasonable notice to Mr. Lombas of the termination of the arrangement, and offered to help him with his payroll tax liabilities. In response, Mr. Lombas admitted that he decided to keep at least $40,000 in distributions that were otherwise owed to the defendants, and filed this lawsuit.

The facts involved in <u>McGuire v. Nelson Brothers</u>, 148 So. 56, 177 La. 302 (La. 1933), establish that the arrangement between the defendants and Lomco was of unspecified duration and could be terminated at the option of either party. In that case, the parties entered into a written contract whereby the plaintiff's mules and equipment were used for the construction work being performed for the Louisiana Highway Commission. <u>Id.</u> The defendant used the plaintiff's mules and equipment for twenty days and then terminated the contract because the plaintiff "appeared daily under the influence of liquor and retarded the work of his teams." <u>Id.</u> "The issue presented is whether or not the contract with the plaintiff was one for use of the plaintiff's mules and implements per day, or for the time required for the completion of defendant's contract with the Highway Commission. We think the lower court correctly held that the contract was not for any fixed period of time, and that it was terminable at the option of either party thereto." <u>Id.</u> For similar reasons, this Court should regard the arrangement between the defendants and Lomco as one of unspecified duration that could be terminated at the option of either party. Similar circumstances were addressed in <u>Chauvin v. Tandy Corp.</u>, 984 F.2d 695 (5th Cir. 1993), and in <u>Deus v. Allstate Insurance Company</u>, 15 F.3d 506 (5th Cir. 1994), <u>cert. denied</u>, 115 S.Ct. 573 (1994). Lomco did not provide any special consideration to the defendants in connection with the term of the agreement, and Lomco's arrangement with the defendants was for an indefinite period and was an at will relationship. <u>Chauvin v. Tandy Corp.</u>, 984 F.2d at 698.

Unless a contract is for a definite term of time, there is no enforceable action for damages under Louisiana law, as the contract can be terminated at the will of either party. <u>Deus v. Allstate Insurance Company</u>, 15 F.3d at 517; and, <u>Brannan v. Wyeth Laboratories</u>, 526 So.2d 1101, 1104 (La. 1988). Any alleged detriment that Lomco incurred while working with the defendants was

offset by the gains received from the gross profit distributions from the amounts paid by Quality Shipyards. Lomco has not demonstrated any valuable consideration that would limit the defendants' right to terminate the arrangement at will. As such, Lomco has no legal claim for damages as his alleged indefinite term for the arrangement is unenforceable as a matter of Louisiana law. Deus v. Allstate Insurance Company, 15 F.3d at 518.

### 3. Alternatively, the Defendants Had Just Cause to Terminate the Arrangement

The defendants alternatively submit that they had "just cause" to terminate the arrangement with Lomco. In this case, the events leading up to and contributing to the defendants' decision to terminate Lomco's arrangement are undisputed. Pat Lombas of Lomco admitted that he did not categorize all of the workers as welders or fitters because he would not make enough money, if he did so; he further admitted that he was at least $40,000.00 behind in making payments on payroll taxes; he admitted giving gratuities to Quality Shipyards in violation of their policy; and, he admitted to bouncing the payroll checks issued to some of the Indian workers on two or three separate occasions. Any one of these events would constitute "just cause" under Louisiana law justifying the termination of Lomco's arrangement with the defendants. Chauvin v. Tandy Corp., 984 F.2d at 699.

### Conclusion

Falcon Steel Structures, Inc., Chad Chandler, Terry Forrester and Labor Consultants International, L.L.C., defendants, through their undersigned counsel, respectfully request that the Court grant their motion for summary and dismiss Lomco's lawsuit with prejudice, and award all taxable costs and other relief allowed by law to the defendants. The defendants alternatively request that the Court grant partial summary judgment in their favor and finding that the contract was of

12

unspecified duration and that the defendants provided reasonable notice of the termination of the arrangement.

Respectfully submitted:

_____
GEORGE D. FAGAN (#14260)
Leake & Andersson, L.L.P.
1100 Poydras Street
1700 Energy Centre
New Orleans, Louisiana 70163
Telephone: (504) 585-7500
Facsimile: (504) 585-7775

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 29, 2002, a copy of the foregoing pleading was served upon all counsel of record by United States mail at their last known address, first class postage prepaid.

_____
GEORGE D. FAGAN

F \35566\PLEADING\MSJ-MEM SUP

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED